UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60026-CR-WILLIAMS/SNOW

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARVIN HARRIS,

    Defendant.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS

This MATTER is before the Court on the Defendant's Motion to Suppress. [D.E. 30]. The Court held a hearing on the Motion on May 18, 2012. Both sides presented witnesses and arguments. As discussed in open court, Defendant's Motion as to the Defendant's driver's license and statement of his name and origin during his initial encounter with the agents is DENIED. For the reasons stated in open court and below, Defendant's Motion as to the statement given at the Department of State's Miami field office is GRANTED.[1]

## I. Background[2]

The Government has charged the Defendant with one count of knowingly and willfully making a false statement in an application for a passport. [D.E. 11]. On November 18, 2006, the Defendant allegedly applied for a United States passport under

---

[1] The Government represented that it did not intend to introduce any statement the Defendant gave at his mother's home, so that portion of Defendant's Motion is DENIED AS MOOT.

[2] The background section reflects the Court's finding of facts based upon a credibility assessment of witnesses at the May 18, 2012 hearing.

1

the name C.W.F. The Government claims Defendant presented a drivers' license in C.W.F.'s name as proof of identity for the application. A photo of the Defendant was attached to the application. However, in August 2010, another C.W.F. applied for a United States passport. Consequently, both applications were flagged for potential fraud and the United States Department of State began an investigation. As part of that investigation, Special Agent Duane Gordon--who testified at the suppression hearing-- flew to the United States Virgin Islands to question the family of C.W.F., who the Government believed to be the true C.W.F. C.W.F.'s family confirmed his identity and denied knowing the Defendant.[3]

The investigation was then closed for unspecified reasons. When a supervisor realized it had been languishing and/or unattended, the investigation was reopened in February 2012. On February 1, 2012, Agent Gordon and two other Department of State agents interviewed the Defendant's mother ("M.C.") about the two passport applications. The agents showed M.C. a picture of the Defendant and M.C. identified the Defendant as her son and stated he had been born in Jamaica. Agent Gordon testified that M.C. admitted that she helped Defendant fill out his allegedly fraudulent passport application. The agents asked M.C. where they could locate her son and she told them. She also sent her nephew Shaquille with the agents to help them find and identify the Defendant.

The agents drove in two cars approximately 300 yards from M.C.'s house to Defendant's residence, where Defendant was standing outside washing a car. Shaquille immediately identified the Defendant for the agents. One of the agent's cars pulled in front of the Defendant and the other pulled behind him. The agent in the car

---

[3] Agent Gordon was unable to speak to the other C.W.F. at the time he interviewed the family.

2

with Shaquille told him that the Defendant was going to be arrested for immigration issues. The agents then got out, approached the Defendant and announced that they were law enforcement officers. Agent Gordon testified that he displayed his badge to the Defendant (which was beside his holstered gun). The Defendant was asked for his name. He told the agents his name was Marvin Harris. The Defendant was then asked for identification. As he reached in his pocket to get his driver's license, Agent Gordon stopped him and reached for the driver's license himself. Defendant's driver's license, which was issued in Jamaica, identified him as "Marbin Harris." At this juncture, Agent Gordon placed the Defendant in handcuffs.

Thereafter, Agent Gordon searched the Defendant's apartment. Agent Gordon claims that because Defendant stated--"in response to questioning"--that he had a minor daughter, Gordon was searching to ensure that no minor children were at home. Agent Gordon further testified that the Defendant consented to the search.[4] In his Motion, the Defendant claims that he told Agent Gordon that his daughter was in school and that the agents searched his apartment without his consent. M.C corroborated the Defendant's story at the hearing: she told Agent Gordon, before he went to the Defendant's home, that the Defendant had taken his daughter to school that morning. No additional evidence was taken from the apartment.[5] The Defendant remained in handcuffs throughout the search.

---

[4] Interestingly, when asked whether he considered obtaining a search warrant, Agent Gordon responded that since he was not entering the apartment to look for evidence of a crime, a warrant was unnecessary.

[5] The Court has found that the Defendant had his driver's license on his person and that it was not taken from the apartment. And because no other evidence was obtained from the apartment, there is no evidence subject to this Motion. However, Agent Gordon's responses to inquiries regarding warrantless

3

The agents then transported the Defendant to his mother's home.[6] Once they arrived at M.C.'s home, Agent Gordon took Defendant's personal effects because he "knew [the Defendant] was going to get arrested." Agent Gordon then began to question the Defendant in front of his mother. While during his grand jury testimony Agent Gordon stated that he did not interview the Defendant at his mother's home, in his affidavit attached to the Complaint, Gordon stated that he "continued to interview [Defendant]" at his mother's home. At the hearing, Agent Gordon reconciled this seeming inconsistency by stating that he simply "questioned" the Defendant at his mother's home; he did not "interview" him.[7] Gordon testified that he asked the Defendant if he ever applied for a passport. Defendant initially responded no. Agent Gordon testified that at this point, Agent Gordon looked at M.C. "because prior to that, before getting the defendant, we discussed that he did apply for a passport. She acknowledged that she filled out the passport application for him and he signed it. So I looked at [M.C.] and she just looked down and he realized that, okay well, I guess she told him." After this exchange, when asked again, the Defendant changed his answer to yes. At this time, Agent Gordon stated that the Defendant was formally placed under arrest and read his *Miranda* rights.

---

searches were, at best, problematic and, at worst, suggestive of an overall failure to appreciate constitutional requisites.

[6] Agent Gordon testified that it was the Department of State's policy to have all non-agent personnel handcuffed during a transport. When questioned by the Defendant's attorney, Agent Gordon acknowledged that Defendant's cousin, Shaquille, was not cuffed while in the agent's car.

[7] Agent Gordon explained that the term interview can be "misinterpreted." He acknowledged that a defendant interviewed while in custody must be given *Miranda* warnings but made a distinction in a situation like this where "just" a "question" was posed to Mr. Harris. In this case, the Court does not recognize the applicability of the distinction described by Agent Gordon.

4

The agents drove the Defendant from his mother's home to the Department of State's Miami field office where he was put in a holding cell for twenty minutes and offered lunch. Agent Gordon then brought the Defendant to an interview room. While being interviewed, the Defendant was in leg shackles. Agent Gordon, who conducted the entire interview, was accompanied at all times by a second agent, but not always the same agent. The Defendant was again given *Miranda* warnings and signed a written advice of rights form. The Defendant was interviewed for approximately forty-five minutes to an hour, during which time he made a full confession orally and in writing. Defendant seeks to exclude his confession made at the Miami field office, arguing that the Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600 (2004), mandates its suppression.

## II. Analysis

The question before the Court is whether Defendant's *Miranda* rights were violated such that his second confession, given after *Miranda*, is excludable. The threshold question for whether *Miranda* has been violated is whether or not the Defendant is in custody. "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). The test for whether a defendant is in custody is an objective, not subjective, test and "the reasonable person from whose perspective custody is defined is a reasonable innocent person." *Id.* Therefore, the test for custody is not whether the Defendant felt free to leave the site of the police confrontation: the "free-to-leave inquiry reveals only whether

the person questioned was seized . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010). The test looks at the totality of the circumstances: whether the officers drew their weapons, touched the suspect, or used language/tone that indicated they would compel compliance if it wasn't given. *Id.*

Based upon the facts and circumstances in the case at bar, the Court concludes that the Defendant was in custody when the agents placed him in handcuffs in front of his home. At that point, a reasonably innocent person would understand his freedom to be "curtailed to a degree associated with formal arrest." *Id.* Thus, the Defendant was in custody when he was transported to his mother's home and interrogated there.

Because the Defendant was in custody at his mother's home when he made certain statements in response to Agent Gordon's questions, Defendant was entitled to *Miranda* rights before being questioned. The government, however, does not seek to admit the Defendant's statements at his mother's home.[8] Rather, the Government seeks to admit the Defendant's later statement at the Miami field office.

The Supreme Court and the Eleventh Circuit have considered whether a subsequent statement given after *Miranda* is admissible if a defendant gave a prior, un-*Mirandized* statement. The first case on the issue is *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, an eighteen year old was arrested on burglary charges. Before he was arrested, the defendant was sitting in his living room with a police officer while

---

[8] It should be noted that at no time--in pleadings or at the hearing--did the Government dispute that the Defendant was in custody upon being handcuffed at his home and thus, importantly, the Government does not dispute that Defendant was in custody during the interrogation at his mother's home.

6

another officer explained to the suspect's mother that he was being arrested. *Id.* at 300. In response to an officer's statement that the officer believed the suspect was involved in the incident, the suspect admitted that he was at the scene of the burglary. *Id.* The suspect was then taken downtown and read his *Miranda* rights where he made a complete confession (orally and in writing), and acknowledged that he was at the scene and participated in the burglary. *Id.* at 301. The defendant admitted that the officers made no threats or promises to him in either location. *Id.* at 302. The Court held that the admissibility of any subsequent statement, made after *Miranda* was administered, depended on whether such subsequent statement was "knowingly and voluntarily made." *Id.* at 309. "The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." *Id.* at 310. The court found the initial statement to be voluntary. *Id.* at 315. "[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* at 318. The second statement was found to be admissible.

The Supreme Court revisited the issue of subsequent statements in *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, the police intentionally failed to give the defendant, who had been convicted of second degree murder, *Miranda* warnings before questioning her. *Id.* The suspect was picked up at a hospital, taken to the police station, left alone for twenty minutes and then questioned for thirty to forty minutes without the benefit of *Miranda* warnings. *Id.* at 604-05. The questioning officer testified

7

that he made a "conscious decision" to withhold *Miranda* rights and employed the question first, give *Miranda* warnings second technique that he had been taught. *Id.* at 606. After the defendant gave a confession, she was given a twenty minute coffee break. *Id.* at 605. The officers then gave her *Miranda* rights and obtained a signed waiver. *Id.* After her rights were read to her, the police resumed questioning the suspect, leading her back through her earlier admissions. *Id.*

In deciding to suppress both the initial (pre-*Miranda*) confession and the subsequent (post-*Miranda*) statement, Court determined that "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 613. The Court found that the lower court's allowance of the post-*Miranda* statement in reliance on *Elstad* was misplaced: the first admission in *Elstad* came during a "brief stop in the living room" while another officer spoke to the boy's mother. *Id.* at 614. The pause in the living room was not for purposes of interrogation, but to tell the suspect's mother of the pending arrest. *Id.* The Court in *Elstad* found the failure to warn an "oversight"-- there was no evidence of coercion. *Id.* The *Seibert* Court explained that while *Elstad* rejected the "cat out of the bag" argument --"any short, earlier admission, obtained in arguably innocent neglect of *Miranda*, determined the character of the later, warned confession," *id.* at 615--the situation in *Seibert* was different. The Court considered "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the

8

interrogator's questions treated the second round as continuous with the first" to be important distinctions from *Elstad*. *Id.* Additionally, in *Elstad* the change from the home to the police station and from a short conversation to a lengthy interrogation were different enough such that the *Miranda* warnings could present a genuine choice as to whether or not to speak. *Id.* In contrast, the *Seibert* pre-*Miranda* interrogation was systematic and exhaustive: there was little else to be said; the pause between the two interrogations was only 15-20 minutes; and the same police officers were involved. *Id.* Moreover, the police didn't tell the suspect that her prior statement without *Miranda* could not be used. *Id.* at 616. Factoring these considerations into the analysis, the second statement in *Seibert* was held to be inadmissible.

The Eleventh Circuit considered the relationship between *Elstad* and *Seibert* in *United States v. Street*, 472 F.3d 1298 (11th Cir. 2006). Street was an Atlanta police officer who was suspected of robbing a bank. *Id.* at 1302. A witness to the robbery wrote down a license plate number that was traced to Street and law enforcement set up surveillance of Street's home until they saw him leave in the same car the witness identified. *Id.* Street was pulled over (one police car blocking his path in the front and another behind) and approached. The officers never drew their weapons and specifically advised Street that he was not under arrest. *Id.* The officers told Street that they suspected the car that Street was driving had been involved in a robbery. *Id.* He was given the option to speak to them on the road or back at his home and Street agreed to go back home. *Id.* Initially, the officers' conversation with Street was not about the robbery but about his day's activities. *Id.* at 1303. At some point, he consented to a search of two cars. *Id.* The interview continued and Street then

9

consented to a search of his bedroom. *Id.* At that point, no confessions or inculpatory statements had been made. *Id.* But after the discovery of potentially incriminating evidence, Street had an outburst ("f*ck it") and the officer asked if he wanted to discuss the robbery. *Id.* at 1303-04. Street said yes. After a brief initial statement from Street, the officer gave incomplete *Miranda* warnings and then questioned Street generally about the robbery. *Id.* at 1304. Street made some incriminating statements. *Id.* He was then presented with a written waiver form, was fully Mirandized and made an oral and written confession. *Id.* Subsequently, Street was allowed to collect some personal items and say goodbye to his parents, then was handcuffed for the first time. *Id.*

The Eleventh Circuit held that the initial, incomplete *Miranda* warnings were insufficient, and thus anything said up to the point of the formal warning was inadmissible. *Id.* at 1312. In dealing with the subsequent statement, the court considered both *Elstad* and *Seibert*. The Court found that *Elstad* was the general rule, which meant that the statements Street made after being fully *Mirandized* were admissible "because all of his statements were knowingly and voluntarily made." *Id.* at 1313. The Court based this knowing and voluntary determination on the fact that Street was questioned at home, that he was not constrained, that the questioning was done conversationally, that it was not prolonged, that he was given some *Miranda* warning and that he had law enforcement experience. *Id.*

Relying on Justice Kennedy's opinion as controlling (because of the plurality decision) in *Seibert*, the court found that *Seibert* posited an exception to *Elstad* that was "aimed at putting a stop to the deliberate use of a particular police tactic employed for

the specific purpose of undermining the Miranda rule." *Id.*[9] In deciding whether such tactics, including the "question first" technique, were used, courts should look at a totality of the circumstances. Such circumstances should include "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements." *Id.* at 1314. Even if the "question first" tactic is used, curative measures can allow admission of a subsequent confession. Such measures would include a substantial break in time and location or an additional warning that the pre-*Miranda* statement will not be admissible. *Id.* Under these circumstances, the Court found Street's second confession to be covered under the general *Elstad* rule and thus admissible.

Applying these precedents to the case at bar, the Court finds that the Defendant's second statement must be excluded. As an initial matter, the agents knew that they would be arresting the Defendant when they found him. One agent explicitly stated as much to Defendant's cousin Shaquille before the agents even approached the Defendant in his front yard. And Agent Gordon testified that he "knew" he was going to arrest the Defendant when he emptied the Defendant's pockets.[10] The Defendant--in handcuffs--was clearly in custody and should have been Mirandized. Instead of an inadvertent failure to give *Miranda* warnings like *Elstad*, the Court finds that Agent

---

[9] The Government acknowledged at the hearing that such "tactics" need not explicitly be the "question first" technique, though the Court finds that technique was used in this case. The important question to address is whether the tactic used was deliberate and whether such a tactic undermined *Miranda*.

[10] While the test for whether a defendant is actually in custody is an objective one, as described above, whether the officer knew or intended the defendant be in custody goes to the officer's intent with regard to the interrogation and the deliberateness or simple inadvertence of failing to give Miranda. *See Seibert*, 542 U.S. at 620 (Kennedy, J.b concurring) (discussing the deliberateness prong of *Seibert* and stating that an officer may not realize that a suspect is in custody and warnings are required, which would implicate *Elstad*. It is clear from this record, however, that Agent Gordon realized the Defendant was in custody.)

Gordon intentionally failed to give the Defendant *Miranda* warnings even though he was in custody and Agent Gordon intended to question him.

Next, the Court finds that Agent Gordon intentionally and deliberately drove the Defendant to his mother's home to question him in front of her. This was not a brief stop in the living room like *Elstad*, in a house where both the defendant and his mother lived. Nor was this a conversation in the Defendant's own home (that elicited an excited utterance by the defendant) like *Street*. This was a deliberate custodial interrogation of a Defendant in an environment chosen by law enforcement because of the likelihood it would exert pressure on the Defendant to incriminate himself.

The Court does not find credible the assertion that the agents took the Defendant back to his mother's home because they needed her to confirm his identity. Agent Gordon knew that the Defendant was not the C.W.F. listed on the passport application as early as 2010 when he interviewed C.W.F's family in the Virgin Islands. He had already interviewed M.C. who identified a picture of her son, and told him that her son was born in Jamaica. Her nephew Shaquille identified the Defendant when the agents pulled up to the Defendant's house. And the Defendant identified himself and provided a driver's license from Jamaica with his name. Consequently, the Court is left to conclude that the sole purpose of the trip to Defendant's mother's home was not to identify the Defendant, but was instead a calculated interrogation tactic.

Agent Gordon intended to use the possible liability of the Defendant's mother in this matter to pressure the Defendant to give an incriminating statement without appropriate *Miranda* warnings. Although the Government attempts to distinguish the case at bar from *Seibert* by arguing that the questioning at the Defendant's mother's

home was short and non-exhaustive, it fails to recognize that the temporal factor is not dispositive here owing to the nature of the charge. Because here, the questioning at M.C.'s home went directly and, in terms of culpability, exhaustively, to the single issue of the case – whether or not the Defendant had filed a fraudulent passport application.

Moreover, the Court does not find that the initial, un-Mirandized statements at M.C.'s home were knowing and voluntary, but instead finds that there was an element of coercion involved because of the deliberate introduction of his mother's presence to the interrogation. Again, while the government insisted at the hearing that his mother's presence was reminiscent of *Elstad*, the Court disagrees. As a factual matter, in *Elstad*, the suspect's mother was in the kitchen, away from her son, when he made the statements. And in *Elstad*, mother and son lived in the same house. More critically, there was no suggestion of any kind that Elstad's mother was involved in the crime. Here, Agent Gordon testified that he had confronted M.C. with the question of her assisting her son in filling out the passport application and she admitted to him that she had.[11] Further, he stated that he had done an informal handwriting comparison of the application at issue and M.C.'s own passport application and believed the two to be authored by M.C.; he testified that he "already knew" she had filled out the form before he questioned her. Patently, Agent Gordon intended to use this scenario--his mother's complicity--to influence the Defendant to make an incriminating statement. The Court thus finds that the un-Mirandized questioning of the Defendant at his mother's home involved an element of coercion and was not completely knowing and voluntary.

---

[11] At the hearing, M.C. denied that she had made this admission. Whether true or not, it is clear that for purposes of this discussion, Agent Gordon believed M.C. an "accomplice" and conducted himself accordingly.

13

Additionally, this was not a brief stop as in *Elstad*, but was akin to the purposeful interrogation tactic that was used in *Seibert*. Notably, the Defendant was not given even partial *Miranda* warnings like the defendant in *Street*. Also, the Defendant did not have any law enforcement experience like the defendant in *Street*, and was particularly vulnerable because of his questionable immigration status and his mother's potential criminal exposure. Finally, Agent Gordon was a consistent police presence throughout the interrogation. Based upon the totality of the circumstances, the Court finds that *Seibert* applies to the case at bar and requires the second statement be excluded unless sufficient curative measures were taken.

As described in *Street*, such curative measures can include a substantial break in time, location, or an additional warning that the previous, un-Mirandized statement cannot be admitted into evidence. *Street*, 472 F.3d at 1314. There is no evidence in the record that the agents informed the Defendant that any statements given prior to *Miranda* were inadmissible. Additionally, though the location of the interrogation changed, the second interrogation was at a police station and the Defendant was always in handcuffs (and later in leg shackles) while being questioned by the same person (Agent Gordon). And these events happened sequentially--the arrest at the Defendant's home, the interrogation at his mother's home, the transport to the Miami field office, the subsequent interrogation--without a truly significant break in time. As a result, the Court does not find that the *Miranda* violation was cured such that the second statement would be admissible.

The second statement given at the Miami field office is thus SUPPRESSED.

DONE AND ORDERED in Chambers at Miami, Florida, this 29th day of May, 2012.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE